UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RBS CITIZENS FINANCIAL GROUP, INC. and RBS SECURITIES, INC., *Plaintiffs*, *v.* HEWITT ASSOCIATES, LLC, *Defendant.* | Civil No. 3:13cv1696 (JBA) June 22, 2016 |

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs RBS Citizens Financial Group, Inc. and RBS Securities, Inc. (collectively "RBS") filed this suit against Defendant Hewitt Associates, LLC ("Hewitt") on November 14, 2013, alleging breach of contract (Count One) and negligence (Count Two), arising out of Hewitt's performance under the Master Consulting Agreement signed by the parties. The parties now bring cross motions for summary judgment. Oral argument was held on June 14, 2016. For the following reasons, Plaintiffs' Motion [Doc. # 32] for Summary Judgment is granted in part and denied in part, and Defendant's Motion [Doc. # 35] for Summary Judgment is granted in part and denied in part.

## I. Background

### A. Master Consulting Agreement

In 2007, RBS and Hewitt entered into a Master Consulting Agreement ("MCA"), under which, effective January 2008, Hewitt agreed to perform Leave Administration services for RBS, pursuant to a Delivery Model incorporated by reference into the MCA. (*See* MCA, Ex. A to Stip. Facts [Doc. # 32-3] ¶ 7(d); *id.*, Attachment B, Delivery Model.) Under the Delivery Model, Hewitt agreed to provide the following services related to the Family and Medical Leave Act ("FMLA") and analogous state statutes:

[1] [RBS] [e]mployee contacts [Hewitt] via phone to initiate FMLA leave[;]

[2] [Hewitt] verifies employee's eligibility, any applicable state laws, and if the request is for a qualifying reason. [Hewitt] then sends FMLA confirmation letters with [Certification of Health Provider ("CHP")] form to employee[;]

[3] [Hewitt] notifies [RBS] via email of employee's intent to take leave. Employee returns completed CHP to [Hewitt] for approval/denial[;] . . .

[4] [Hewitt] sends FMLA approval or denial letter to employee, notifies [RBS] via email[;]

[5] [Hewitt] sends updated employment status to [Human Resources Service Center] system to reflect leave status.

(Delivery Model at 4.)

The MCA obligated Hewitt to perform these services "in a professional manner . . . with the training, skills, and professional credentials as may be necessary to perform such Services in accordance with customary industry standards and practices." (MCA ¶ 7(c).) Additionally, Hewitt agreed to "indemnify and hold [RBS] . . . harmless from and against any and all claims, demands, actions, damages, losses, liabilities, and expenses of any nature (including reasonable attorneys' fees and expenses) arising from Hewitt's performance of the Services resulting from: Hewitt's or its Consultants' negligence . . . ." (*Id.* ¶ 8(a).) However, the MCA provided that "[i]n no event will either party be liable to the other party for incidental, consequential, special, or punitive damages (including loss of profits, data, business or goodwill, or government fines, penalties, taxes, or filing fees), regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages." (*Id.* ¶ 8(c).)

### B.  FMLA/Connecticut FMLA Leave Calculations

The FMLA provides that eligible employees may take up to twelve weeks of job-protected unpaid leave for qualifying reasons in a twelve month period. 29 U.S.C. § 2612. The Connecticut analog to the FMLA ("CT FMLA") provides employees with up to sixteen weeks of job-protected unpaid leave in a twenty-four month period. Conn. Gen. Stat. § 31-51ll. The twelve and twenty-four month periods can be calculated several different ways. *See* Dep't of Labor, *Fact Sheet #28H: 12-Month Period under the Family and Medical Leave Act (FMLA)*, http://www.dol.gov/whd/regs/compliance/whdfs28h.pdf. Under the "rolling year" method, leave availability is measured backward from the date an employee uses any FMLA/CT FMLA leave. *Id.* Thus, each time an employee takes leave, the remaining leave entitlement is the balance of the 12 (or 16, in the case of the CT FMLA) weeks which has not been used in the immediately preceding 12 (or 24, for the CT FMLA) months. *Id.* Under the calendar year method, the 12 and 24-month periods run from January 1 through December 31. *Id.*

Although prior to January 1, 2010, some RBS divisions utilized a calendar year method, at all times relevant to this case, the Global Banking and Markets ("GBM") division utilized a rolling year method. (Stip. Facts ¶¶ 8–9; *see* Ex. B to Stip. Facts.)

### C.  Events at Issue

The seeds of this dispute were sown on October 5, 2009, when RBS (GBM) Senior Operations Analyst (Reconciliation and Control department) Louis Ridgeway fell off an office chair and injured himself. (Stip. Facts ¶ 15.) Mr. Ridgeway requested, and was granted, FMLA leave. (*Id.* ¶ 15; *see* Oct. 2009 Ltr., Ex. D to Stip. Facts.) Because Mr. Ridgeway had previously taken FMLA/CT FMLA leave in May and June 2009, "under a

rolling method of calculating leave[,] his available federal FMLA leave . . . extend[ed] until December 3, 2009, and his available CT FMLA . . . extend[ed] until December 31, 2009." (Stip. Facts ¶ 16; *see* May 2009 Ltr., Ex. C to Stip. Facts.)

On December 1, 2009, Mr. Ridgeway called Hewitt's Florida office to find out how much federal and state leave he had left because his doctor had informed him that his condition could be improved through an elective surgery (for which he would require additional leave). (Stip. Facts ¶ 18.) He spoke to a Hewitt representative named Eddie Nieto. (*Id*; *see* Ridgeway Dep., Ex. Z to Passarella Decl. [Doc. # 32-4] at 114.) Hewitt's records indicate that Mr. Nieto (erroneously) advised Mr. Ridgeway that he was eligible for "state leave . . . through [the] end of [the] year, and advised [him] that his state leave renew[ed] in 2010." (Hewitt Records, Ex. E to Stip. Facts at 3.) In other words, Mr. Nieto told Mr. Ridgeway that as of January 2010, his "CT FMLA would refresh . . . and he would have the full 16 weeks of entitlement and therefore would have job protection" through April 2010. (*Id*. at 6; *see also* Ridgeway Dep. at 114.)

In fact, utilizing a rolling year method, as of January 1, 2010, Mr. Ridgeway's state leave was exhausted, and he no longer had job protection. (Stip. Facts ¶ 16.) Hewitt, however, did not inform RBS of Mr. Nieto's conversation with Mr. Ridgeway on December 1, 2009. (*Id*. ¶ 21.)

As a result, on December 3, 2009, RBS approved the recruitment of an analyst from the Principal and Interest ("P & I") division to replace Mr. Ridgeway, who RBS apparently believed, had overstayed his leave. (*Id*. ¶ 22; *see* Ex. F to *id*.) On December 7, 2009, Mr. Ridgeway's manager, Koren Horsey, emailed her RBS Human Resources Partner, Dawn Hughes, about Mr. Ridgeway's leave status, noting that the last she had heard from Hewitt

was that Mr. Ridgeway was only approved for leave until December 3, 2009. (Stip. Facts ¶¶ 23–24; *see* Ex. G to *id.* at 2–3.) Ms. Hughes forwarded the email to Erika House, a Hewitt representative, who responded that Mr. Ridgeway's "short-term disability was extended through 01/27/2010. [His] Family Medical Leave Act exhausted on 12/3/09, so as of 12/4/09 [he] remain[s] on Connecticut FMLA until 12/31/2009. Connecticut FMLA will run up to 16 weeks. As of 01/01/2010 [he] will no longer be eligible for job protection but will remain on short-term disability." (Ex. G to Stip. Facts at 2.)

Mr. Ridgeway, in reliance on the information he had received from Hewitt, failed to return from his leave on December 31, 2009. (Stip. Facts ¶ 27.)  As a result, on January 6, 2010, Mr. Horsey declared, by email to several RBS employees, "We are going to officially replace Louis Ridgeway. I would like to transfer Scott Fabbri from P & I to [Reconciliation and Control ('Rec & Control')] to replace Louis. This will open a role in P & I." (Horsey Email re Fabbri, Ex. H to Stip. Facts.) "No one from RBS—including Ms. Horsey—made any attempt to telephone, email or otherwise contact [Mr.] Ridgeway, directly or indirectly, when he did not return to work in January 2010 until January 25, 2010." (Stip. Facts ¶ 32.) On January 25, 2010, Ms. Hughes sent Mr. Ridgeway a letter notifying him that his "Family Medical Leave allowance has exhausted as of January 1, 2010 and [his] position as a Senior Operations Analyst has been put into the posting process/is no longer available." (Ex. I to *id.*) By email dated February 9, 2010, Hewitt informed Ms. Hughes that Mr. Ridgeway's short-term disability leave had been extended to February 7, 2010, but his job protection remained exhausted. (Ex. J to Stip. Facts.)

Mr. Ridgeway, after receiving the January 25, 2010 letter from Ms. Hughes, called Hewitt on February 17, 2010 to clarify whether he did in fact have job protection through

April, as Hewitt had previously told him. (*See* Hewitt Records at 3–4.) The Hewitt representative confirmed that "he was eligible for job protection to 4/22/10 and after that date RBS was no longer required to hold his position." (*Id.* at 4.) RBS did not learn that Hewitt had told Mr. Ridgeway that he was on job-protected leave until April 9, 2010, when Mr. Ridgeway contacted Ms. Hughes.[1] (Stip. Facts ¶ 39.)

Shortly thereafter, Heidi Lane, a representative of the Connecticut Department of Labor ("CT DOL") contacted Amy Gare, RBS's in-house employment attorney, and told her that she believed RBS was required by law to reinstate Mr. Ridgeway. (*Id.* ¶ 40; *see* 2012 Gare Dep., Ex. K to *id.* at 59.) Ms. Gare testified that based on her conversation with Ms. Lane, she "understood that there may be an obligation to reinstate Mr. Ridgeway if it was possible." (2012 Gare Dep. at 59.)

Nonetheless, RBS did not reinstate Mr. Ridgeway. Rather, "[f]ollowing its policy for employees returning from additional leave after the expiration of FMLA leave, RBS gave [Mr.] Ridgeway 45 days to find a new position within the company and sent him a link to all available jobs." (Stip. Facts ¶ 42; *see* Ex. BB to Passarella Decl.) Mr. Ridgeway did not seek other employment with RBS, and RBS and Mr. Ridgeway failed to reach a separation agreement. (Stip. Facts ¶ 43.) Mr. Ridgeway's employment with RBS ended on July 1, 2010. (*Id.* ¶ 44.)

---

[1] Hewitt subsequently confirmed to Ms. Hughes that a Hewitt representative had told Mr. Ridgeway that he would have a full 16 weeks of job-protected leave beginning January 1, 2010. (*See* Hewitt Records at 6.)

**D.  Underlying Litigation**

On October 10, 2010, Mr. Ridgeway filed a complaint with the CT DOL, claiming that RBS had interfered with his rights under the CT FMLA. (*Id.* ¶ 46.) Eight months later, on June 16, 2011, Mr. Ridgeway filed a complaint against RBS in federal court, alleging interference and retaliation under the FMLA, wrongful termination in violation of public policy, termination in violation of Conn. Gen. Stat. § 31-51q, promissory estoppel, and negligent misrepresentation. *See Ridgeway v. RBS*, 3:11cv976 (D. Conn.), Compl. [Doc. # 1].

By decision dated March 27, 2012, Judge Vanessa Bryant dismissed Mr. Ridgeway's claims of wrongful termination and termination in violation of § 31-51q, but permitted his remaining claims to go forward. *See id.*, Mem. Decision Def.'s Mot.  Dismiss [Doc. # 40]. The parties proceeded to discovery, during the course of which RBS made two admissions relevant here: (1) "[i]n the conversation with Hewitt Associates on or about December 1, 2009, Hewitt granted Ridgeway's FMLA leave to begin on January 1, 2010" and (2) "[i]n December of 2009, Hewitt granted Ridgeway an FMLA leave to begin on January 1, 2010 and to run for twelve weeks." *Id.*, Mem. Decision Mot. Withdraw Judicial Admissions and Mot. Summ. J. [Doc. # 135] at 11.

RBS subsequently sought to withdraw these admissions, arguing that the summaries provided by Hewitt of its phone calls with Mr. Ridgeway revealed that Hewitt had only advised Mr. Ridgeway that his CT FMLA would refresh in January 2010 and not his FMLA. *Id.* Judge Bryant, however, denied RBS's motion, reasoning:

> In view of the fact that the recording of the December 1, 2009 call has been destroyed, Ridgeway would clearly suffer prejudice as a consequence of the withdrawal because he would now need to obtain evidence of the recording

> that was destroyed. This is particularly prejudicial where RBS was aware of the need to preserve the recording as early as February 2010 when Ridgeway responded to Hughes's letter placing Hewitt on notice that there was a dispute regarding FMLA entitlement and at the latest by April 2010 when Hughes learned that Ridgeway had been provided with incorrect information by Hewitt and when Hewitt emailed an account of the recorded call to RBS regarding Ridgeway's dispute. Lastly the need to preserve the recording had clearly arisen when on April 22, 2010, [Ronni] Greenberg, an RBS Human Resource Representative, acknowledged that Hewitt provided Ridgeway with incorrect information and told him that it was "unfortunate" but that "we were correct to send you a letter stating [that your leave was exhausted] . . . . [T]he people that we outsource to would have been incorrect to tell you that it was not exhausted." Further, the Court is not persuaded that withdrawal would promote the presentation of the merits as there is evidence in the record that lends credence to [the] truthfulness of the admissions such as the May 20, 2009 and October 13, 2009 letters Hewitt sent on RBS letterhead, which expressly indicated that FMLA leave was calculated on a calendar year basis. Further, the principal piece of evidence RBS relies on to support its position that withdrawal is warranted is Ebonie's email account of the December 1 call to Hughes which is arguably inadmissible and self-serving hearsay. . . .
>
> [T]here is no indication that the admission is no longer true as a result of Ebonie's email which contained her third party account of the recorded call. Moreover, because the recording has been destroyed there is no assurance that either party can point to which would definitely establish what was actually said during that call.

*Id.* at 29–30.

The court granted summary judgment in RBS's favor on Mr. Ridgeway's FMLA retaliation claim, finding that "no reasonable trier of fact could conclude that RBS's decision to terminate him was influenced by [Mr.] Ridgeway contacting the CTDOL." *Id.* at 46. However, the court denied summary judgment on Mr. Ridgeway's FMLA interference, promissory estoppel, and negligent misrepresentation claims. *Id.* at 60. On August 12, 2013, Mr. Ridgeway and RBS settled the case for $400,000, including attorneys'

fees. (Stip. Facts ¶ 62.) RBS now seeks indemnification from Hewitt for the costs of that settlement.

## II. Discussion[2]

RBS claims that Hewitt breached the MCA by failing to provide the services specified in the Delivery Model and by refusing to indemnify RBS, and that Hewitt was negligent in giving Mr. Ridgeway inaccurate information and in failing to inform RBS that it had done so. Each of these claims is discussed in turn.

### A. Breach of Contract

RBS's breach of contract claim is governed by Rhode Island law, as established in the MCA. (*See* MCA ¶ 13(j).) "'To succeed on a breach of contract claim under Rhode Island law, a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff.'" *Charles Place Assocs. v. Carrier Corp.*, No. CA 09-535 M, 2013 WL 3716650, at *5 (D.R.I.

---

[2] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

July 12, 2013) (quoting *Barkan v. Dunkin' Donuts Inc.*, 627 F.3d 34, 39 (1st Cir. 2010)). There is no dispute here that an agreement existed between the parties. However, the other elements are in dispute.

### 1. Whether Hewitt Breached the Contract

As clarified at oral argument, Plaintiffs contend that Hewitt breached the MCA by failing to comply with the provisions of the Delivery Model and by failing to indemnify RBS.

### a. Delivery Model Provisions

Plaintiffs allege that Defendant breached the following provisions of the Delivery Model (which is incorporated into the MCA) after Mr. Ridgeway's December 1, 2009 phone conversation with Eddie Nieto: (1) the duty to verify Mr. Ridgeway's eligibility for leave and send him an FMLA confirmation letter; (2) the duty to notify RBS of Mr. Ridgeway's intent to take leave; (3) the duty to send an FMLA approval or denial letter to Mr. Ridgeway and notify RBS it has done so; and (4) the duty to send an updated employment status to the Human Resources Service Center. (*Id.*)

Hewitt does not deny that it did not perform the above services. However, it maintains that its failure to do so did not constitute a breach because: (1) Hewitt did not grant or deny Mr. Ridgeway leave during the December 1, 2009 phone call, and it is unclear whether Mr. Ridgeway even requested additional leave during that call or if he was "simply exploring his options"; and (2) if Hewitt did extend Mr. Ridgeway's leave into January 2010, it was not a breach of contract to do so because "[n]othing in the Master Consulting Agreement contains a guarantee of accuracy." (Def.'s Opp'n [Doc. # 33] at 12.)

These claims are unavailing. With respect to the first argument, as Plaintiffs note in reply

> [t]he February call undermines [Hewitt's] theory and confirms that Hewitt had granted Mr. Ridgeway leave in December. The representative in February stated that Mr. Ridgeway was eligible for job protection until 4/22/10, exactly 16 weeks from January 1. If Mr. Ridgeway wasn't on leave in February (because his December call had been merely exploratory), but the representative believed he was eligible for leave, the representative would have stated that he still has 16 weeks available (i.e., until June 9). If Mr. Ridgeway wasn't on leave in February, but the representative believed he was ineligible for leave, he would have told Mr. Ridgeway that. The only possible explanation for the February call, during which Mr. Ridgeway was told that he was on leave until April 22, is that Hewitt granted Mr. Ridgeway leave in December.

(Pls.' Reply [Doc. # 34] at 7–8 (internal citations omitted).) Indeed, this is consistent with what Mr. Ridgeway himself testified. (*See* Ridgeway Dep. at 114.)

Hewitt's second argument is plainly belied by the provision of the MCA requiring Hewitt to "verify" the eligibility of an employee seeking leave under the FMLA or a state equivalent. Where, as here, "contract language is clear and unambiguous, words contained therein will be given their usual and ordinary meaning." *Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 238 (R.I. 2004) (internal quotation marks omitted). Under the ordinary meaning of "verify"—"to establish the truth, accuracy, or reality of," Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/verify—Hewitt's failure to ensure that Mr. Ridgeway was eligible for leave before approving such leave is a breach of the contract.[3]

---

[3] At oral argument, Hewitt raised, for the first time, the argument that in the FMLA context, the question of an employee's "eligibility" for leave is separate and distinct from the question of whether the employee has exhausted her leave. Although it is true that the

Moreover, because there is no dispute that Hewitt failed to: notify RBS of Mr. Ridgeway's intent to take leave from January to April; send Mr. Ridgeway an FMLA approval letter and notify RBS it had done so; and send the Human Resources Service Center an updated employment status for Mr. Ridgeway reflecting that he had been granted leave for January to April, no reasonable jury could find that Hewitt did not breach the Delivery Model provisions of the MCA.

### b. Indemnification Provision

RBS next argues that Hewitt breached the contract by failing to indemnify RBS for Hewitt's negligence. For purposes of the breach of contract count, Hewitt "concede[s] that it was negligent in giving incorrect advice to [Mr.] Ridgeway concerning the 2010 renewal of his CT FMLA eligibility." (Def.'s Opp'n at 10.) However, it denies that this negligence caused Plaintiffs' damages, and thus argues that it had no obligation under the indemnification clause to indemnify Plaintiffs, and its failure to do so was not a breach of the contract. Because the Court's analysis of this argument necessarily turns on its finding with respect to causation, the Court turns to that issue now.

---

FMLA and the CT FMLA define the term "eligible employee" without reference to whether the employee has exhausted her leave, there is nothing in the MCA to suggest that the parties here intended such a narrow definition of eligibility. Rather, under the contract, Hewitt commits to perform all of the steps involved in administering FMLA leave with the exception of three duties specifically carved out: (1) contacting the employee and the employer regarding the employee's return-to-work status; (2) denying an FMLA request without first discussing it with the client; and (3) contacting or receiving communications from medical providers. In such circumstances, it is not reasonable to assume that the parties intended that Hewitt would verify whether the employee was an "eligible employee" under the law and "if the request is for a qualifying reason" but not whether the employee was actually eligible to take that leave because she had not exhausted her leave. As such, the Court declines to adopt such a narrow interpretation of the contract.

12

### 2. Causation

Defendant contends that even if it breached the MCA, it nonetheless is not liable for breach of contract because Plaintiffs' claimed damages were not proximately caused by that breach.[4] (*See* Def.'s Mem. Supp. Mot. Summ. J. [Doc. # 35-1] at 17–23.)

"In order to establish proximate causation, a plaintiff must establish that the harm would not have occurred but for the [act] and that the harm [was a] natural and probable consequence of the [act]."[5] *Petro v. Town of W. Warwick ex rel. Moore*, 889 F. Supp. 2d 292, 341 (D.R.I. 2012) (internal quotation marks omitted). While other events may have contributed to the plaintiff's injury, the breach of contract "must have been a substantial or

---

[4] Defendant also contends that "RBS assumed the risks associated with its decision refusing to reinstate [Mr.] Ridgeway after being advised by the CT DoL that it was required to do so" and "[a] plaintiff is barred from recovering from a negligent defendant if [the] plaintiff knew of the existence of the danger posed by [the] defendant's conduct, appreciated and understood its significance or unreasonable character, and then voluntarily exposed itself to danger at the time of the incident." (Def.'s Mem. Supp. at 20.) This theory, though it has some surface appeal, does not withstand scrutiny. First, the evidence in the record is that RBS understood that the CT DoL had directed it to reinstate Mr. Ridgeway "if possible," and it is RBS's contention that it was not possible to do so. Second, the damage RBS ultimately suffered was unrelated to any exposure under the CT FMLA because Mr. Ridgeway's CT FMLA claims were dismissed as unexhausted before the case settled. (*See* Ruling Mot. to Dismiss, Ex. N to Stip. Facts at 27–30.) RBS therefore cannot be said to have "assumed the risk" of incurring damages by failing to abide by the CT DoL's direction where the damages it incurred did not arise out of the danger of which the CT DoL warned (liability under the CT FMLA).

[5] Plaintiffs argue that because the MCA requires indemnification for damages "arising from" Hewitt's negligence, they only need to show a "causal connection," rather than proximate cause. (*See* Pls.' Reply at 3–4.) However, because, as discussed below, the Court finds in Plaintiffs' favor on the causation element even utilizing the narrower "proximate cause" form of causation, the Court does not address this argument, raised for the first time in Reply.

primary cause." *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1191 (R.I. 1994). No liability will exist where "an independent and unforeseeable intervening or secondary act of negligence occurs, after the alleged" breach of contract "and that secondary act becomes the sole proximate cause of the plaintiff's injuries." *Oden v. Schwartz*, 71 A.3d 438, 450 (R.I. 2013) (internal quotation marks omitted). "[A]n intervening act of negligence will not insulate a[] [defendant] if it appears that such intervening act is a natural and probable consequence of the [defendant's] act." *Id.* at 450–51 (internal quotation marks omitted). "Additionally, it is well settled that for an independent intervening cause to replace a defendant's original negligence as the proximate cause of an accident, the original negligent conduct must have become totally inoperative as a cause of the injury." *Contois v. Town of W. Warwick*, 865 A.2d 1019, 1027 (R.I. 2004) (internal quotation marks and alterations omitted).

Here, Defendant claims it is not liable for RBS's damages because RBS's own actions were intervening causes.[6] These actions include: (1) RBS's failure to call Mr. Ridgeway or engage in an interactive process with him before replacing him, allegedly in violation of the Americans with Disabilities Act (*see* Def.'s Mem. Supp. at 17–19); (2) RBS's failure to

_____

[6] Defendant, citing *Rhode Island Hosp. Trust Nat'l Bank v. Dudley Serv. Corp.*, 605 A.3d 1325, 1327 (R.I. 1991), relatedly argues that "a contract will not be applied to indemnify a party against losses resulting from its own wrongdoing unless the intention to do so is clearly and unequivocally expressed in the contract." (Def.'s Opp'n at 10.) To the extent Defendant intends this as simply a restatement of the argument that RBS's actions constituted intervening causes, that argument is addressed above (and below). Defendant's reliance on *Rhode Island Hospital Trust National Bank* in support, however, appears misplaced, as Plaintiffs here do not contend that the contract should be applied to indemnify them against losses arising from their own wrongdoing, but rather that it should be applied to indemnify them against losses arising from *Hewitt's* wrongdoing.

reinstate Mr. Ridgeway, although RBS knew it was required to do so under the CT FMLA (*see id.* at 17); (3) RBS's failure to submit a claim to its employment practices liability insurer, which, RBS concedes (*see* Stip. Facts ¶ 49) would have covered the claim (*see* Def.'s Mem. Supp. at 17); and (4) RBS's erroneous admission in the underlying litigation that Mr. Ridgeway received incorrect information about his FMLA rights (*see id.* at 18). Plaintiffs, not surprisingly, argue to the contrary.

### a. RBS's Failure to Call Mr. Ridgeway before Replacing Him & Failure to Reinstate Mr. Ridgeway

Defendant asserts that RBS's failure to call Mr. Ridgeway in January 2010 before replacing him[7] and its failure to reinstate him in April 2010 were intervening acts of negligence that severed the causal connection between Plaintiffs' damages and Hewitt's breach of contract. (Def.'s Mem. Supp. at 18.) The Court is not persuaded. Even assuming that RBS's conduct was negligent, no reasonable jury could find that this negligence caused "the original negligent conduct [to] become totally inoperative as a cause of the injury." *Contois*, 865 A.2d at 1027. Nor could a reasonable jury find that RBS's conduct was unforeseeable or not a natural and probable consequence of Hewitt's actions. *See Oden*, 71 A.3d at 450. Rather, reasonable jurors hearing this evidence could only conclude that the

---

[7] Defendant further claims that this conduct violated the Americans with Disabilities Act ("ADA"). (Def.'s Mem. Supp. at 18.) As Plaintiffs note in response, however, Mr. Ridgeway himself never raised an ADA claim nor claimed that RBS failed to reasonably accommodate him, and "[t]here has been no individualized assessment to determine whether Mr. Ridgeway had a disability under the ADA at the relevant time and whether he was a qualified individual with a disability, able to perform the essential functions of his position with or without a reasonable accommodation." (Pls.' Reply at 5–6; *see also* Pls.' Opp'n [Doc. # 36] at 8–11.)

natural and probable consequence of Hewitt informing Mr. Ridgeway on December 1, 2009 and February 17, 2010 that he had job-protected leave until April 2010, while telling RBS on December 7, 2009 and February 9, 2010 that his leave expired at the end of December 2009 was that RBS would replace Mr. Ridgeway in January 2010 when he did not return to work, and that is in fact what occurred. Hewitt's conduct not only set in motion the process that eventually led to RBS's damages, but kept it in motion.

### b.   RBS's Failure to Submit Claim to Insurance

Defendant next contends that RBS's failure to submit a claim to its employment practices liability insurer for the damages it seeks to recover here constitutes an intervening cause of RBS's damages.[8] (Def.'s Mem. Supp. at 17.) This argument must be dismissed out of hand. Because RBS had no duty to submit a claim to its insurance company, its failure to do so was not, as a matter of law, negligent.

### c.   RBS's Judicial Admission

Finally, Hewitt asserts that RBS's judicial admission in the underlying case (that Mr. Ridgeway received incorrect information about his FMLA—as opposed to his CT FMLA—rights) was negligent and severed the causal chain between Hewitt's negligence and RBS's damages. (See Def.'s Mem. Supp. at 17–18.) RBS responds that "[b]ased on Mr. Ridgeway's testimony" (that he could not recall whether the Hewitt representative had told him he was covered under the FMLA or CT FMLA) and the May and October 2009 letters from Hewitt (in which Hewitt erroneously wrote that FMLA leave was calculated on a calendar year

---

[8] Because the Court concludes that RBS's failure to submit a claim to its insurer was not an intervening cause, it does not reach Plaintiffs' contention that Defendant's argument is barred by the collateral source rule. (See Pls.' Opp'n at 15.)

16

basis), Mr. Ridgeway's "FMLA interference claim would have survived summary judgment regardless of the admissions." (Pls.' Opp'n at 17.) Further, Plaintiffs argue, "Mr. Ridgeway's negligent misrepresentation and promissory estoppel claims focused on the promise of protected leave until April 22," whether under the CT FMLA or the FMLA, "and therefore, any issues regarding the admission and/or distinctions between the FMLA or CT FMLA leave are immaterial for these claims." (*Id.*)

Initially, the Court is not persuaded that RBS's admission, whether negligent or not, was an "independent and unforeseeable intervening . . . act of negligence" which "becomes the sole proximate cause of the plaintiff's injuries." *Oden*, 71 A.3d at 450. Moreover, the Court finds merit in Plaintiffs' contention that Mr. Ridgeway's negligent misrepresentation and promissory estoppel claims likely would have survived summary judgment irrespective of RBS's admission.

For the foregoing reasons, no reasonable jury could find that Hewitt's conduct was not *a* proximate cause of RBS's damages or that RBS's negligence was *an* intervening cause.

### 3.  Damages

Hewitt raises two arguments with respect to the final element of breach of contract: (1) RBS failed to mitigate its damages; and (2) the damages for which RBS seeks indemnification are consequential damages, explicitly excluded by the MCA. (*See* Def.'s Mem. Supp. at 20; Def.'s Opp'n at 15; Def.'s Reply [Doc. # 37] at 6.)

#### a.  Duty to Mitigate

Defendant claims that RBS is barred from collecting damages because its damages were avoidable, and under Rhode Island law, a party "is prohibited from recovering damages that it could have reasonably avoided." (Def.'s Opp'n at 10.) Indeed, "[t]he law in

Rhode Island is well settled that a party claiming injury has a duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages." *McFarland v. Brier*, 769 A.2d 605, 610 (R.I. 2001) (internal quotation marks omitted). "The law commands reasonable efforts and ordinary care in the circumstances, not Herculean exertion." *Tomaino v. Concord Oil of Newport, Inc.*, 709 A.2d 1016, 1026 (R.I. 1998) (internal citations omitted). "When mitigation of damages is at issue the defendant has the burden of proving by affirmative evidence[] that the plaintiff failed to adequately mitigate his or her damages." *McFarland*, 769 A.3d at 610 (citing *Bibby's Refrigeration, Heating & Air Conditioning, Inc. v. Salisbury*, 603 A.2d 726, 729 (R.I. 1992)). Here, Hewitt argues that Plaintiffs failed to satisfy their duty to mitigate by failing to make reasonable efforts to a) find or b) create an opening for Mr. Ridgeway between April and July 2010. (*See* Def.'s Mem. Supp. at 21–23.)

### i.   Whether There was an Open Position in Rec & Control

As a preliminary matter, it appears self-evident that if there were an open position in Mr. Ridgeway's department for which he was qualified between April 9, 2010 (when RBS learned of Hewitt's errors) and July 1, 2010 (when Mr. Ridgeway was terminated), reasonable efforts to mitigate would have included RBS offering Mr. Ridgeway that position. Plaintiffs do not appear to argue otherwise, contending instead that no such position existed.

The parties agree that when Mr. Ridgeway initially went on leave in October 2009, RBS hired Scott Fabbri to perform Mr. Ridgeway's job functions on a temporary basis. (Stip. Facts ¶ 29.) However, what happened after that is the subject of dispute. Ms. Horsey offers one version of events, while two sets of personnel records appear to set out two alternative pictures of what occurred.

One set of personnel records, which apparently traces all movements in and out of Mr. Ridgeway's position in the Rec & Control department (OED# OPSAM13305), show that: (1) on January 11, 2010, Mr. Ridgeway's role was assigned to John Woods, who held the position until April 9, 2010, when he left the firm; (2) Mr. Woods was replaced by Theresa Boccio on June 29, 2010, and she held the position until August 4, 2010, when she left the firm; and (3) on January 3, 2011, Ms. Boccio was replaced by Richard Huber. (*See* 13305 Employees, Ex. L to Stip. Facts.) Relying on this record, a reasonable jury could find that as of April 9, 2010, there was an open position in Rec & Control that could have been given to Mr. Ridgeway.

A second set of personnel records, which lists all transfers in and out of Operations between April 2010 and June 2011, shows that Mr. Woods was hired as a temporary employee on January 11, 2010 in place of Mr. Ridgeway in Rec & Control. (*See* Reconciliation Dep't Records, Ex. G to Marks Decl. at 1.) The records do not reveal that Mr. Woods was ever transferred out of Rec & Control, but perplexingly, when Mr. Woods departed and was replaced by Theresa Boccio (another temporary employee), the records indicate that his position was in the P & I department. (*Id.*) Adding to the confusion, when Ms. Boccio was replaced by Mr. Huber (a permanent employee) on January 3, 2011, the records appear to show that Mr. Huber was in the Rec & Control department.[9] (*Id.*) A reasonable jury, construing this record, could conclude that Mr. Woods, Ms. Boccio, and

---

[9] The records do not clearly indicate whether Mr. Huber was in P & I or Rec & Control, but since the parties stipulated that the P & I department moved to Utah in the fall of 2010 (Stip. Facts ¶ 30) and Mr. Huber is listed as working in Stamford, it appears that Mr. Huber was in the Rec & Control department.

Mr. Huber were all in the Rec & Control department, and because Mr. Woods and Ms. Boccio were only temporary employees, and Mr. Huber was not hired until January 2011, RBS could have given Mr. Ridgeway his position back.

In Ms. Horsey's telling, Mr. Woods and Ms. Boccio did not replace Mr. Ridgeway in Rec & Control, but rather Scott Fabbri in P & I. (Horsey Dep. 2012, Ex. 1 to Marks Reply Decl. [Doc. # 37-1] at 172.) Specifically, Ms. Horsey avers: (1) in December 2009 (when P & I employee John Gaudino left), Scott Fabbri was made a permanent employee in the P & I department, although he continued to do Rec & Control work (Horsey Dep. 2012, Ex. R to Passarella Decl. at 137); (2) on January 6, 2010, when Mr. Ridgeway still had not returned to work, RBS moved Mr. Fabbri to Rec & Control to formally replace Mr. Ridgeway, thereby opening a position in the P & I group (*see* Horsey Dep. 2012 at 138; Horsey Email re Fabbri); and (3) John Woods was hired as a temp in P & I on January 11, 2010, and Ms. Boccio replaced him as a temp in P & I thereafter (Horsey Dep. 2012 at 172). A reasonable jury relying on Ms. Horsey's testimony could conclude that there was no open position in Rec & Control that RBS could have given to Mr. Ridgeway.

Because the evidence regarding openings in the Rec & Control department is contradictory and could lead reasonable jurors to reach different conclusions regarding whether there was an opening for Mr. Ridgeway in the Rec & Control department, there is a genuine dispute of material fact on this issue and summary judgment is not appropriate.

### ii. Whether Reasonable Efforts Required RBS to Create a Position or Place Mr. Ridgeway in P & I

Hewitt next asserts that even if there was no opening in Rec & Control for Mr. Ridgeway, RBS could have created a position for him or placed him in P & I, and its failure

to do so is grounds for finding a failure to mitigate. Specifically, Hewitt argues that Scott Fabbri's transfer from P & I was merely a "paper transfer," and because no permanent replacement was hired in P & I until the fall of 2010, RBS could have easily undone that "paper transfer" and created a position for Mr. Ridgeway. (*See* Def.'s Mem. Supp. at 22; Def.'s Opp'n at 14; Def.'s Reply at 5–6.) While, as a general matter, reasonable efforts would not dictate that an employer create an entirely new position for an employee, from the summary judgment record in this case, it appears that a position in P & I may have been available (as discussed above), and that Mr. Ridgeway may have been qualified to take such a position.

Ms. Horsey testified that "Mr. Ridgeway was not qualified to perform positions within" P & I (Horsey Aff., Ex. 2 to Pls.' Opp'n ¶ 6), but as Defendant notes, she also testified that when Mr. Fabbri was doing Mr. Ridgeway's job in December 2009, he was working from the P & I department (Horsey Dep. 2012 at 138) (from which one could reasonably infer that Mr. Ridgeway, too, could have done Rec & Control work from the P & I department). Further, although Ms. Horsey testified that had Mr. Ridgeway returned to work in December 2009 (after Mr. Fabbri had been permanently assigned his role but before Mr. Ridgeway's job-protected leave expired), she would have "figured out how to allocate the work" between Mr. Ridgeway and Mr. Fabbri, she offered no explanation for why such an allocation could not have been made in April 2010. (*Id.* at 154.)

Because there is a genuine dispute of material fact regarding whether, through reasonable efforts, RBS could and should have given Mr. Ridgeway a position in P & I, summary judgment on this issue is not appropriate.

21

### b. Consequential Damages

Defendant next contends that RBS's claimed damages were consequential damages, which the MCA does not permit parties to recover.[10] "Consequential damages are such damages 'that do not flow directly and immediately from an injurious act but that result indirectly from the act.'" *Riley v. Stafford*, 896 A.2d 701, 703 (R.I. 2006) (quoting Black's Law Dictionary 416 (8th ed. 2004)). Although Defendant is correct that the MCA excludes consequential damages, the Court does not agree with Defendant that the damages claimed here are consequential. Mr. Ridgeway's lawsuit against RBS arose directly out of Hewitt's negligence, and the damages RBS suffered as a result are therefore not consequential.

Having determined that no reasonable jury could find that Hewitt did not breach the contract, that Hewitt did not proximately cause damage to RBS, or that RBS's damages were consequential, summary judgment is granted in Plaintiffs' favor as to Hewitt's liability

---

[10] Hewitt cites *TD Waterhouse Investor Serv., Inc.* in support of its argument. (*See* Def.'s Opp'n at 15–16.) In that case, "TD Waterhouse employed [the] defendant as its agent to perform certain accounting . . . services," including calculating the "net asset value of each Portfolio of the Fund and the per share net asset value of each Portfolio of the Fund." 2003 U.S. Dist. LEXIS 70, at *3 (S.D.N.Y. Jan. 3, 2003). "TD Waterhouse was contractually entitled to shareholder services fees" at an annual rate, calculated based on the daily net asset value of the fund's Money Market Portfolio. *Id.* at *4. From June 1998 to November 1999, the "defendant erroneously recorded less than the actual amount of income," and as a result, TD Waterhouse claimed to have "waived approximately $1.5 million in fees in addition to the fees that they would ordinarily have waived." *Id.* at *4–5. It sought reimbursement of those fees from the defendant under an indemnification clause. *Id.* at *5. The court, applying New York law, found that "TD Waterhouse did not in fact 'lose' any money of which it was already in possession on account of Integrated's error, and would have waived fees—as it routinely did—regardless of whether or not Integrated committed an accounting error." *Id.* at *7. This case has no applicability here, however, because the Court does not find that RBS would have incurred its damages irrespective of Hewitt's negligence.

for breach of contract. However, because there are genuine disputes of material fact regarding whether RBS utilized reasonable efforts to mitigate its damages, summary judgment is not warranted on Defendant's affirmative defense of failure to mitigate.

### B. Negligence

Turning to the negligence count, as a preliminary matter, the Court must determine which state's law to apply to RBS's negligence claim. RBS asserts that Florida law should be applied (*see* Pls.' Mem. Supp. Mot. Summ. J. [Doc. # 32-1] at 29), while Hewitt advocates for application of Rhode Island or Connecticut law (*see* Def.'s Opp'n at 9–10). Because "[t]he threshold choice of law question in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between the applicable laws of the states with a potential interest in the case," the Court begins with that question. *Lumbermens Mut. Cas. Co. v. Dillon Co.*, 9 F. App'x 81, 83 (2d Cir. 2001).

RBS maintains that there is a conflict between Florida law on the one hand and Rhode Island and Connecticut law on the other because Rhode Island and Connecticut apply the "economic loss rule," while Florida does not. *Compare Ulbrich v. Groth*, 310 Conn. 375, 410 (2013) ("[T]he economic loss doctrine bars negligence claims that arise out of and are dependent on breach of contract claims that result only in economic loss.") *and Franklin Grove Corp. v. Drexel*, 936 A.2d 1272, 1275 (R.I. 2007) ("The economic loss doctrine provides that a plaintiff is precluded from recovering purely economic losses in a negligence cause of action." (internal quotation marks omitted)) *with Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 407 (Fla. 2013) ("[W]e now limit the application of the economic loss rule to cases involving products liability . . . ."). Defendant does not disagree that Florida has abrogated the economic loss doctrine in cases

not involving products liability, but it claims that "Florida courts have re-affirmed that the same principles underlying the economic loss rule, though unnamed, continue to apply in contract-based cases." (Def.'s Opp'n at 7.) The Court agrees.

> As explained by the Rhode Island Supreme Court, under the economic loss rule
>
> a plaintiff may not recover damages under a negligence claim when the plaintiff has suffered no personal injury or property damage. . . . [W]hen parties have contracted to protect against potential economic liability, . . . contract principles override . . . tort principles . . . and, thus, purely economic damages are not recoverable.
>
> Our rationale for abiding by the economic loss doctrine centers on the notion that commercial transactions are more appropriately suited to resolution through the law of contract, than through the law of tort. We have stated that it is appropriate for sophisticated commercial entities to utilize contract law to protect themselves from economic damages.

*Franklin Grove*, 936 A.2d at 1275 (internal quotation marks and citations omitted).

Although Florida has formally limited application of this rule to products liability cases, Defendant appears to be correct that Florida courts continue to adhere to the principles underlying the rule. *See Burdick v. Bank of Am., N.A.*, 99 F. Supp. 3d 1372, 1378 (S.D. Fla. 2015) ("'It is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such a breach can constitute negligence.'" (quoting *Tiara Condo. Ass'n*, 110 So. 3d at 408–09 (Pariente, J., concurring)); *Tulepan v. Roberts*, No. 14-CV-80574, 2015 WL 235441, at *6 (S.D. Fla. Jan. 16, 2015) ("*Tiara Condominium* does not overrule common law contract principles . . . [requiring a plaintiff to] prove the tort is independent of any breach of contract."); *Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-61687 (CIV), 2014 WL 2215770, at *4 (S.D. Fla. May 29, 2014) ("[T]he fact that the economic-loss rule does not apply to cases where the parties

24

are in contractual privity does not mean that parties in contractual privity may recast causes of action that are otherwise breach-of-contract claims as tort claims."). As Judge Pariente explained in concurrence in *Tiara Condo. Ass'n,*

> The majority's conclusion that the economic loss rule is limited to the products liability context does not undermine Florida's contract law or provide for an expansion in viable tort claims. Basic common law principles already restrict the remedies available to parties who have specifically negotiated for those remedies, and, . . . our clarification of the economic loss rule's applicability does nothing to alter these common law concepts. For example, in order to bring a valid tort claim, a party still must demonstrate that all of the required elements for the cause of action are satisfied, including that the tort is independent of any breach of contract claim.

> While the contractual privity form of the economic loss rule has provided a simple way to dismiss tort claims interconnected with breach of contract claims, it is neither a necessary nor a principled mechanism for doing so. Rather, these claims should be considered and dismissed as appropriate based on basic contractual principles . . . .

110 So. 3d at 408–09 (Pariente, J., concurring) (internal quotation marks and citations omitted).

Indeed, Florida has long held, consistent with common law principles, that "[i]t is only when [a] breach of contract is attended by some additional conduct which amounts to an independent tort that such breach can constitute negligence." *Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So. 2d 518, 519 (Fla. Dist. Ct. App. 1986); *see also Weimar v. Yacht Club Point Estates, Inc.*, 223 So. 2d 100, 103 (Fla. Dist. Ct. App. 1969) ("The true question in any case involving tort liability is, 'Has the defendant committed a breach of duty apart from the contract?'"). Because it appears that this remains good law in Florida, and because there is no dispute that the economic loss doctrine exists in Connecticut and Rhode Island, it is unimportant which state's law the Court applies to Plaintiffs' negligence

claim; under any of these state's laws, to proceed on their negligence claim, Plaintiffs must demonstrate that the alleged breach of contract was "'attended by some additional conduct which amounts to an independent tort.'" *Burdick*, 99 F. Supp. at 1378 (quoting *Tiara Condo. Ass'n*, 110 So. 3d at 408–09 (Pariente, J., concurring)).

Plaintiffs admitted at oral argument that they can make no such additional showing, and as such, under Connecticut, Rhode Island, or Florida law, they are barred from bringing a claim of negligence. Summary judgment is therefore granted in Defendant's favor on the negligence count.

### III. Conclusion

For the foregoing reasons, Plaintiffs' Motion [Doc. # 32] for Summary Judgment is GRANTED as to liability for breach of contract and DENIED as to the negligence count. Defendant's Motion [Doc. # 35] for Summary Judgment is DENIED as to the breach of contract count and as to its affirmative defense of failure to mitigate, and GRANTED as to the negligence count. A trial will be held on the limited issue of Defendant's affirmative defense of failure to mitigate.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of June 2016.

26